VENETIA K. CARPENTER-ASUI
A Law Corporation

VENETIA K. CARPENTER-ASUI  6901
Haseko Center, Suite 812
820 Mililani Street
Honolulu, Hawaii 96813
Telephone: (808) 523-6446
Facsimile: (808) 523-6727

Attorney for Plaintiff
BRUCE G. SCHOGGEN

FILED IN THE
UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

DEC 02 2004

at ___ o'clock and ___ min. ___ M.
WALTER A. Y. H. CHINN, CLERK

## IN THE UNITED STATES DISTRICT COURT

### FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| BRUCE G. SCHOGGEN,<br><br>Plaintiff,<br><br>vs.<br><br>HAWAII AVIATION CONTRACT SERVICES; JAPAN AIRLINES; JALWAYS CO., LTD., a subsidiary of Japan Airlines; and DOES 1-10,<br><br>Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) |

Civil No. __CV04 00707 ACI__

COMPLAINT; DEMAND
FOR JURY TRIAL; SUMMONS

## COMPLAINT

Plaintiff BRUCE G. SCHOGGEN ("Plaintiff") alleges and states:

### I.    PARTIES

1.    Defendant JAPAN AIRLINES ("Defendants JAL") is a business entity with its principal place of business located in Tokyo, Japan.

2.    Defendant JALWAYS CO., LTD ("Defendants JAL") is a subsidiary of Defendant JAPAN AIRLINES, and was formerly known as "Japan Air Charter Co., Ltd," registered with the State of Hawaii, Department of Commerce and Consumer Affairs, Business Registration Division since March 28, 1991 to provide air transport services in

EXHIBIT 6

the State of Hawaii. Defendants JAPAN AIRLINES and JALWAYS CO., LTD will be referred to collectively herein as "Defendants JAL."

3.    Defendant HAWAII AVIATION CONTRACT SERVICES, INC. ("Defendant HACS"), is a corporation with its principal place of business in Honolulu, Hawaii. Defendant HACS provides a service whereby it contracts flight crews to Defendants JAL.

4.    BRUCE G. SCHOGGEN ("Plaintiff") is a United States citizen currently domiciled in Reno, Nevada.

5.    Plaintiff does not know the true names of Defendants DOES 1 through 10, and therefore sues them by those fictitious names. Plaintiff is informed and believes, and on the basis of that information and belief alleges, that each of those defendants was in some manner legally responsible for the events and happenings alleged in this complaint and for Plaintiff's damages. The names, capacities and relationships of DOES 1 through 10 will be alleged by amendment to this complaint when they are known.

6.    Plaintiff is informed and believes, and on that basis alleges, that at all times mentioned in this complaint, Defendants HACS and JAL were the agents and employees of their codefendants, and in doing the things alleged in this complaint were acting within the course and scope of that agency and employment.

## II.    JURISDICTION AND VENUE

7.    Jurisdiction is based on diversity of citizenship, 28 U.S.C. Section 1332(a)(3), because the amount in controversy exceeds $75,000.00 and this is an action between citizens of different states and in which citizens or subjects of a foreign state are additional parties. This Court has pendant jurisdiction of Plaintiff's state law claims.

Venue in this judicial district is proper pursuant to 28 U.S.C. Section 1391(s)(2), because a substantial part of the events or omissions giving rise to the claim occurred in the District of Hawaii.

### III.   FACTS

9.     On January 27, 1993, Plaintiff and Defendant HACS signed a "Pilot Contract" employing Plaintiff as a DC-10 Pilot.

10.     The Pilot Contract contained several provisions that establish that Defendants JAL (also referred to as "JAZ") was also an employer of Plaintiff as it controlled the manner and means of Plaintiff's employment:

(a)     "WHEREAS, JAPAN AIR CHARTER CO. LTD., is a foreign corporation established in accordance with the laws of Japan, whose address is Sumitomo Hamamatsu Cho Building, Tokyo, Japan, and is hereinafter referred to as 'JAZ';"

(b)     "WHEREAS, JAZ conducts flight operations as an air carrier and needs personnel rated and able to be trained to fly as captain, first officer, flight engineer, who are in possession of the qualifications specifically provided hereunder, hereinafter, collectively, CREWMEMBERS;"

(c)     "WHEREAS, HACS has the ability to supply such CREWMEMBERS; and WHEREAS, JAZ desires to use such CREWMEMBERS for their charter operations;"

(d)     "WHEREAS, SHOGGEN, desires to be employed as a crewmember for HACS under its current agreement with JAZ..."

(e)     "When SCHOGGEN has been qualified to fly for JAZ, i.e., all training, testing, line checking, are completed, he shall be obligated to fly for five (5) years, i.e., sixty (60) consecutive months subsequent to the competition of flight training and JAZ certification."

(f)     "HACS shall assign SCHOGGEN to JAZ for the periods and purposes noted in paragraph 1, above."

(g)     "SCHOGGEN shall be certified to be qualified in accordance with specifications set forth in JAZ Operations Manual."

(h)     "SCHOGGEN understands that in the event the needs of JAZ ..."

(i)     "SCHOGGEN understands that JAZ and HACS shall screen and agree to his assignment to JAZ"

(j)     "SCHOGGEN understands that he is not eligible for promotion during the agreed term unless otherwise agreed by both JAZ and HACS."

(k)     "SCHOGGEN understands that he shall perform his services in accordance with the regulations and procedures of **JAZ**. However, should there be any conflict between **JAZ**"

(l)     "HACS will be responsible for giving a complete briefing to SCHOGGEN insuring that he is familiar with the terms, conditions and expectations of **JAZ** with respect to salary, working conditions, no strike provisions, etc."

(m)    "SCHOGGEN acknowledges that **JAZ** has the right to supplement the HACS crew compliment, including non-Japanese crews, to act as coordinators and/or managers of **JAZ** flight and charter operations."

(n)     "SCHOGGEN understands that **JAZ** has the authority to govern the conduct of, and to supervise, direct, and control CREWMEMBERS assigned hereunder during the performance of those duties for which they are assigned to **JAZ**. **JAZ** and HACS shall exercise their best efforts and will cooperate with each other in order to coordinate their efforts to accomplish said governing, supervision, direction and control."

(o)     "SCHOGGEN understands that HACS must, at the request of **JAZ**, terminate the assignment of any CREWMEMBER who fails to maintain required qualifications, i.e., flight certification, medical certification, visas required for operations, as per **JAZ** Operations Manual."

(p)     "SCHOGGEN understands that **JAZ** is entitled to claim damages resulting from the shortage of CREWMEMBERS for flight operation, when the shortage of CREWMEMBERS is caused by the negligence of HACS."

(q)     "The JCAB (Japan Civil Aviation Bureau) Medical Certificate, as well as FAA medical certificates shall be obtained and paid for by SCHOGGEN. Initial JCAB Medical Certificate will be paid by **JAZ**."

(r)     "In the event SCHOGGEN fails the required proficiency or type rating checks after receiving applicable training as specified in **JAZ** Qualification Manual, SCHOGGEN understands that **JAZ** and HACS supervisory personnel shall confer and HACS supervisors shall present their opinion with respect to his case. **JAZ** shall determine after said conference, the final disposition of SCHOGGEN'S case."

(s)     "Initial training and checks as well as certification for line flying will be performed at a location or locations chosen by **JAZ**. In the event initial training or subsequent training is failed by SCHOGGEN, he will be given transportation back to his domicile at the origin of this AGREEMENT. Cost of transportation shall be borne by **JAZ**.

4

(t)   "SCHOGGEN understands that **JAZ** shall provide and pay for periodic training and checks for CREWMEMBERS in accordance with the details described in **JAZ** Qualification Manual. Such training and checks shall be specified by **JAZ**.

(u)   "In the event SCHOGGEN is involved in or causes an accident, he shall be deemed an employee of **JAZ**. He will be held harmless by **JAZ** and will be furnished legal counsel at no expense to himself. In the event fellow employees are injured, regardless of the location of the accident, the laws of Hawaii with respect to the Workman's Compensation remedies shall apply, i.e., no cause of action shall exist for **JAZ** against SCHOGGEN nor shall SCHOGGEN have any cause of action against **JAZ** or HACS."

(v)   "HACS Employee Manual will set forth the current benefits available through **Japan Airlines**. Free and reduce fare transportation is open for further discussion and discovery. HACS and **JAZ** shall make their best efforts to obtain free and reduced fare transportation for CREWMEMBERS and their families."

(w)   "SCHOGGEN understands that in the event he is interned for other than criminal conduct, **JAZ** shall continue to pay all amounts otherwise due SCHOGGEN for the duration of said internment."

(x)   "While SCHOGGEN is working or training under the supervision, direction or control of **JAZ**, **JAZ** shall save and hold harmless HACS, its officers, heirs or assigns from any and all claims arising from acts or omissions of SCHOGGEN. HACS shall indemnify same and hold **JAZ** free and harmless from any and all claims of liability brought by any crewmember arising out of, or occurring in the course of such crewmember's performance of services hereunder, or employment agreements with such crewmember, including claims of liability caused by illness, accident or death of any such crewmember. **JAZ** reserves its right to make claims against HACS and Crewmember assigned to **JAZ** reserves its right to make claims against HACS and Crewmember assigned to **JAZ** for damages caused by HACS crewmember while off duty."

(y)   "Assignment of SCHOGGEN to **JAZ** shall be terminated on the date SCHOGGEN refuses or fails to maintain required qualification."

(z)   "In the event that SCHOGGEN becomes permanently physically or mentally unqualified for flight duty as a result of sickness or injury as determined by an approved **JAZ** physician, SCHOGGEN shall be medically retired. Neither HACS or **JAZ** shall be responsible for Medical retirement Benefits."

5

(aa)  "If SCHOGGEN reaches age 60 or JCAB mandatory retirement age, voluntarily resigns or dies, his assignment to **JAZ** is terminated."

(bb)  "SCHOGGEN understands that **JAZ's** Operations Manual, revised, is the controlling document for the **JAZ** operations."

(cc)  "To the extent it does not conflict with the **JAZ** Operations Manual, the HACS Policy Manual shall control."

(dd)  "In the event SCHOGGEN elects to terminate his assignment to **JAZ** prior to completion of his originally agreed upon term, he may do so by providing 90 days' notice to HACS who will in turn seek an acceptable replacement CREWMEMBER."

(ee)  "If SCHOGGEN makes the election provided for in 9.a. above, crewmember shall be responsible to pay to **JAZ** through HACS liquidated damages in the amount of $15,000 per year or fraction thereof, not prorated, remaining in his term of employment with HACS up to a maximum of $75,000 U.S.D."

11.    In addition to Defendants JAL controlling the employment of Plaintiff through its control of Defendant HACS, Defendants JAL and HACS have a written contract between them which further establishes that Defendants JAL was also the employer of Plaintiff. The manner and means Defendants JAL employed through its written contract with HACS to control all aspects of the Plaintiffs employment included, but was not limited to (summarized below due to a protective order in Civil No. 03-00451): licensing required by the JCAB (analogous to our FAA); rights of inspection; rights to reject crewmembers; rights to request HACS terminate crewmembers; crewmembers observance of policies, procedures, regulations; compliance with laws and regulations; rights to request HACS terminate crewmembers; required training; right to reject assignment of crewmembers; crewmembers flight schedules; crewmembers to be available for flights; whether a crewmember is fit to fly or not; right to have its doctors determine fitness to fly; monthly salary; overtime pay; other economic decisions; processing charges; vacation buy-backs; contract bonuses; supervisors allowance; instructors allowance; amounts of pay time; pay proration; pay per diem; hotel

accommodations; payment of parking lot fees; uniforms; monitors sick leave use; requests for medical certificates for sick leave used; right to designate vacation days; right to designate AWOL; accrual of sick leave; whether sick leave was bona fide; determine sick leave credits; buyback rates; earned vacation credits; determine vacation leave credits; AWOL; bereavement leaves; jury duty leaves; rest days; seatings for deadhead and business trips; free and reduced fare transports; right to change rules at its discretion.

12.    A provision in the "Pilot Contract" regarding renewability on page 2 states:

> The term of this AGREEMENT shall run from the date of the signing (execution) of the AGREEMENT until approximately October, 1998 and shall be automatically renewed unless SCHOGGEN notifies HACS in writing at least one year prior to the termination date of this contract that he does not wish to have this contract renewed.

13.    According to Defendants JAL's Operations Manual the basic qualifications for a captain after the sixtieth birthday on page 5-5-1 1.(2) states:

> To posses a current Class 1 Physical Examination Certificate. To have passed the additional testing for those who have reached the age of 60 years and under 63 years of age.

14.    Plaintiff had eleven (11) years of exemplary employment with Defendants HACS and JAL.

15.    The "Pilot Contract" required Plaintiff to undertake a physical examination every six months under Appendix D:

> 1. a. SCHOGGEN understands that he is required have a semi-annual physical examination in addition to all other requirements for physical examinations listed hereinabove and hereinafter. The semi-annual physical is an internal requirement of JAZ and hereinafter designated as PEA.

16.    Prior to June 16, 2004, Plaintiff never failed a physical examination throughout his employment with Defendants HACS and JAL.

17.    On April 16, 2004 Plaintiff underwent a routine physical examination wherein the results were normal and his Japan Civil Aeronautical Bureau ("JCAB") Class 1 Flight Medical license was renewed for another six (6) months through October 9, 2004, and subsequently renewed again through April 19, 2005.

18.    The JCAB Administrative guidance states that crewmembers over the age of sixty (60) years:

> Guidance for crewmember who desire to fly over age 60 must pass the following tests. Crewmembers are required to take these tests between after 59 years and 6 months old and before 60 years old.

> After reaching age 60, Ventilator Function Test and blood sampling are required every 6 months in addition to the regular PE process.

19.    On June 16, 2004, a Defendants JAL doctor conducted a physical examination for the additional testing required of pilots sixty (60) years of age on Plaintiff, and failed him "because of the tendency of ST."

20.    Plaintiff explained to the doctors identified and involved herein that he has long had the tendency of ST because of his status as a long distance runner.  In a publication cited by Jack Scaff, M.D. -- JCAB certified medical examiner in the State of Hawaii, the condition is described.

> Scintigraphaphic determination of ventricular function and coronary perfusion in long-distance runners.
> Osbakken M, Locko R.
> 1: Am Heart J. 1984 Aug; 108(2)296-304.

> Left ventricular function and coronary perfusion were evaluated with rest-exercise gated blood pool and stress-redistribution thallium scans in a group of long-distance runners and compared to a group of catheterization-proved normal subjects. Exercise duration, work load, and oxygen consumption were significantly

8

greater for long-distance runners. Rest end-diastolic volume (EDV), end-systolic volume (ESV), and stroke volumes (SV) were sgnificantly larger in long-distance runners than in control subjects, while ejection fraction (EF), cardiac index (CI), and ejection rate were similar in both groups. Exercise EDV increased and ESV decreased, producing an increase in SV and EF in long-distance runners. Exercise EDV did not change and ESV decreased less producing lesser increase in SV and EF in the control group. Qualitative evaluation of thallium scans showed apparent perfusion defects with normal redistribution in six myocardial segments in five long-distance runners. Quantitative evaluation demonstrated initial defects, which persisted on delay scans, but were associated with normal relative distribution in three ventricular walls in three long-distance runners. In conclusion, left ventricular reserve function was greater in long-distance runners than in control subjects. Endurance exercise can be associated with apparent myocardial perfusion defects, which may be due to uneven ventricular hypertrophy resulting from pressure and volume loads imposed by exercise.

21.    On June 29, 2004  Masanobu Kaji, M.D. Vice President of Medical

Services at Defendants JAL, informed Plaintiff:

> We are informed from Aeromedical Research Center (JCAB Institution  where the additional aviation medical examination for flying past 60 is evaluated) that you are required to undergo "Exercise Thallium myocardial scintigram" due to your findings of treadmill stress testing.

> And this recheck is for a back up to verify that there is no myocardial damage or coronary insufficiency. Please be performed "Exercise Thallium myocardial scintigram" at your doctor and send the report and raw data  to us. The evaluation of your additional aviation medical examination is hold at Aeromedical Research Center until we submit the results.

22.    On July 23, 2004, Plaintiff was examined by Sonny Wong,

M.D. a Cardiologist at Pacific Cardiology, in Honolulu, Hawaii. After performing an

Exercise Thallium  myocardial scintigram on Plaintiff, Dr. Wong wrote: "Impression: 1.

Equivocal stress ECG for ischemia. 2. Excellent exercise tolerance. 3. Appropriate

blood pressure response. 4. Occasional PVCs. 5. Nuclear images reported separately."

9

23.    On July 27, 2004 Plaintiff consulted with Gregg Yamada, M. D., a Cardiologist at Pacific Cardiology in Honolulu, Hawaii.  On July 28, 2004, Dr. Yamada wrote that "[a]pproximately 10-15% of stress tests can be falsely abnormal. i.e. a perfectly normal individual may have an abnormal stress test."

24.    On August 6, 2004 Plaintiff consulted with Colin Fuller, M. D., a Cardiologist at Sierra Nevada Cardiologist Associates, in Reno, Nevada.  Dr. Fuller wrote:

> RECOMMENDATIONS:
> As gentleman is a commercial pilot, I think that we need to be absolutely clear about whether or not he has significant underlying coronary disease or normal coronary arteries.  I have recommended a coronary angiogram and he has agreed.  I have talked to him about the procedure, indications, options and risks.
>
> I told Plaintiff that if he was not a pilot or if he was planning to give up being a pilot, we could possibly get a coronary calcification score and if it was a very low number or zero, I would not recommend an angiogram.  But again, because of his profession, I do recommend an angiogram at this time...

25.    On August 9, 2004 Mr. Brooks Toyama, Operations Manager for Defendant HACS, wrote:

> Secondly, as we have previously discussed, JALways will be removing you from the flight schedule, effective 11 August 2004.  In accordance with the Operations Manual 5-5-2(2), Basic Qualifications: 'To possess a current JCAB Class I Physical Examination Certificate; To have passed the additional testing for those who have reached the age of 60 years and under 63 years of age.'  To date, the completion and satisfaction of the additional testing requirements have yet to be determined.  As a result, you have been removed from all future flight duty until further notice.

26.    On August 11, 2004 Defendants JAL removed Plaintiff from the flight schedule. On August 13, 2004, Plaintiff underwent this invasive surgical procedure and it "revealed no flow limiting stenosis." (Dr. Yamada)

27.    Dr. Fuller's findings after the August 13, 2004 surgery stated: "RECOMMENDATION It is felt that the patient's thallium is falsely abnormal. It is felt this gentleman has absolutely normal coronary arteries without ischemia and no further cardiac evaluation and testing is indicated. He is cleared to resume all normal physical and mental activities including flying commercial airplanes."

28.    On August 13, 2004 Mr. Toyama of Defendant HACS wrote: "[w]e are glad that all went well with your test yesterday."

29.    On August 14, 2004 Plaintiff turned sixty (60) years of age.

30.    In a letter dated August 25, 2004, Dr. Yamada noted that a "catheterization was performed by Dr. [Fuller] on [August 13, 2004] in Reno, NV. This revealed no flow limiting stenosis." Dr. Yamada also noted "Impression: 1. No evidence of flow limiting coronary artery disease. The patient's stress EKG and nuclear stress test findings represent a false positive study. At this time, Mr. Schoggen is able to return to full activity and flight status without the need for future cardiovascular evaluation." A copy was sent to Dr. Scaff -- the JCAB certified medical examiner in Hawaii.

31.    On August 26, 2004, Plaintiff provided Defendants JAL and HACS with copies of Dr. Fuller and Dr. Yamada's letters clearing him to return to full duty.

32.    On September 8, 2004, despite being cleared by his doctors to return to full duty, Defendant HACS President Frank Tabata terminated Plaintiff's employment:

> We regret you that the JCAB has denied your application for a continuance to your medical certificate for flying past age sixty. We have attached the official notification set to the JAL Medical Department for your review. It is written in Japanese. We do not want to misquote the JCAB therefore we have not attempted a verbatim translation.

11

However, we understand the that the gist of the communication is that your application has been denied. Future inquires on this matter should be directed to Dr. Tsukui and Dr. Fukumoto of the JCAB.

33.    On September 8, 2004 Dr. Yamada wrote to Plaintiff:

Dr. Muira said that the 'rules' in Japan only accept a thallium (thallium is interchangeable with the term nuclear stress test) or a regular stress test. He said for you to obtain a waiver so that you can get your flying license. He said that they do not accept the more 'specific' study, the heart catherization.

I told Dr. Muira that Captain Schoggen has no heart disease and that 10-15% of nuclear scans are wrong and false positive. I also told him that if a repeat study was performed it would be read as normal with "artifact" and that study would be normal. Dr. Muira understood this and mentioned that the case of Captain Schoggen was "difficult" and had been discussed.

34.    On September 9, 2004, Plaintiff hired Carina A. Black, Ph.D., a Japanese translator from the University of Nevada at Reno to translate the JCAB official notice denying Plaintiff's application for a continuance of his medical certificate that was sent to Defendants JAL's Medical Department.

35.    According to the JCAB Administrative guidance regarding waivers:

As for crewmembers who have waiver items under the JCAB rules are required to be judged by at JCAB Medical Review Committee (the committee) as to whether they are eligible to proceed to additional JCAB PE tests. To be judged at the Committee, it is required to take PE at Aeromedical Research Center (JCAB institution in Tokyo) and submit the result to the committee. If they are judged eligible by the Committee, they proceed to additional tests above. If qualified in the additional JCAB PE tests, after reaching age 60, regular PE and additional test are both taken at Aeromedical Research Center hereafter.

36.    On September 11, 2004 Plaintiff requested a waiver in writing to take additional required medical examinations in order to fly past the age of sixty (60).

12

37.    On September 13, 2004 Dr. Muria wrote that the Defendants JAL Aeromedical Research Center ("ARC") can not take the angiogram into account.

38.    On September 15, 2004 Dr. Yamada e-mailed Defendants JAL's Chief Medical Director Okoshi Hirofumi, M.D. and reiterated Plaintiff's passing test results and asked why Plaintiff's return to work was taking so long.

39.    On September 16, 2004 Defendants JAL's Head Nurse Chikako Inomata responded to Dr. Yamada's email writing:

> I would also like to tell you that we (Medical Services of Japan Airlines) are not allowed to take any actions for waiver process unless we hear from JALways (Japan Airlines subsidiary company that Mr. Schoggen is flying) and HACS (crew lease company) that Mr. Schoggen is willing to take all examinations and procedures necessary to apply for a waiver and be recertified.

40.    On September 16, 2004 Carl Osaki, Esq., attorney for Defendant HAC's wrote to Plaintiff:

> HACS presently has no control over your activities as a former contract employee; however, HACS will relay to you a request it received from JAL that you do not contact the JCAB physicians or JALways.

Thus, according to Carl Osaki, Defendants JAL refused to allow Plaintiff to receive a waiver, or even to discuss a waiver with them. Defendant HACS termination letter instructed Plaintiff "[f]uture inquires on this matter should be directed to Dr. Tsukui and Dr. Fukumoto of the JCAB." Both Defendants JAL and HACS were aware the Plaintiff had passed all medical testing and was cleared for full duty, nevertheless, they conspired to deprive Plaintiff of employment and a waiver, by pointing the finger at each other, and then both reneging from the waiver process.

41.    On September 22, 2004, Dr. Scaff wrote to Ms. Inomata of Defendant JAL:

Plaintiff was healthy and all the test results displayed that Plaintiff was perfectly normal.

That there would appear to be no apparent contraindications for Plaintiff to continue to fly after the age of sixty.

42.    On September 23, 2004, Carl Osaki, Esq. wrote to Plaintiff:

While HACS has no control over the JCAB, it seems reasonable from HACS' perspective that you may want to follow up on the information provided to you through your direct contact with the JCAB, if you desire in any way to continue with your flying career.

43.    On September 24, 2004 Dr. Scaff wrote a letter to Dr. Stephen Goodman, Regional Flight Surgeon, stating:

It almost goes without saying that all of Mr. Schoggen's Cardiologists, including me, are in unanimous agreement that not only does he not demonstrate any evidence of heart disease (because he has none) but that he is in much better health when compared to other pilots in his age group.

Mr. Schoggen has been given his Aviation Medical Certificate because it does not seem the probability of further work-up should not (sic) be required.

44.    On October 1, 2004 Kathi Ferguson, Vice President of Administration for Defendant HACS informed Plaintiff to proceed to Tokyo to take another physical and submit the results to JCAB. Ms. Ferguson also stated that Plaintiff would be required to sign a completely new employment contract with Defendant HACS which contained less favorable terms than the original contract which was still in effect.

45.    On October 1, 2004 Plaintiff faxed a letter to Ms. Ferguson stating that he would like to continue to fly.

46.    On October 8, 2004 Defendant HACS Operations Manager Toyama wrote to Plaintiff "[p]lease remember that your [physical examination] in [Tokyo] is contingent on you having a signed employment contract." Thus, Defendant HACS was forcing

14



Plaintiff to sign a new contract of employment when he already had an existing contract of employment.

47.    On October 11, 2004 Plaintiff underwent a JCAB physical and obtained a First-class Medical License.

48.    On October 12, 2004, Plaintiff filed a discrimination complaint with the Equal Employment Opportunity Commission ("EEOC") and received a right to sue letter dated October 26, 2004.

49.    The EEOC dual filed Plaintiff's discrimination complaint with the Hawaii Civil Rights Commission ("HCRC") and received a right to sue letter dated November 4, 2004.

50.    Plaintiff filed a timely lawsuit on Thursday, December 2, 2004.

## COUNT I

(Age Discrimination in Employment Act ("ADEA") and s378-2 Hawaii Revised Statutes ("HRS") Age Discrimination)

51.    Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1 to 50 above as fully set forth herein.

52.    Defendants HACS and JAL violated the ADEA 29 USC s623 and s378-2 HRS: a) Plaintiff was a member of a protected class (age 60); b) Plaintiff was performing his job in a satisfactory manner (i.e.: check rides, commendation letters); c) Plaintiff suffered an adverse employment action (i.e.: termination, denial of waiver process); d) Plaintiff was replaced by substantially younger employees with equal or inferior qualifications (i.e.: Michael Hudgins (est. 57), Thomas Trotter (est 45), Edward Gervais (est. 54), Richard Ell (est. 40), James Vanderkamp (est 45), Fredrick Pauwels (est. 45), Michael Urso (est. 58), Keith Bertiaux (est. 59), Michael Gauthier (est. 45), Ronald Varley (est. 52), Chris Vanvoorhis (est. 35), Phillip Bonasera (est. 57), Eric Holck (est. 50), Thomas White (est. 35), Andrew Diago (est. 40), Stephen Grisbrook (est. 40), Darrell Antoniuk (est. 40), Levin Zurcher (est 35), Neil Weaver (est. 35), Wayne

15

Tomchick (est. 40), Bradford Ray (est. 35); e) Defendants HACS and JAL allege that Plaintiff was fired because "the JCAB has denied your application for a continuance to your medical certificate for flying past age sixty." This was a false pretextual reason, Plaintiff has maintained a JCAB medical certificate up to the present, the actual reason was because of Plaintiff's age.

53.    As a direct result of Defendants HACS and JAL's actions/inactions, Plaintiff has suffered damages to be proven at trial herein.

## COUNT II

(Americans With Disabilities Act ("ADA") and s378-2 HRS Disability Discrimination)

54.    Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1 to 53 above as fully set forth herein.

55.    Defendants HACS and JAL violated the ADA 42 USCA s12112 and s378-2 HRS Disability Discrimination: a) Plaintiff is disabled within the meaning of the ADA (i.e.: ST depression); b) Plaintiff is a qualified individual able to perform the essential functions of the job with (or without) reasonable accommodation (i.e.: time off to establish non-disability, waiver); c) Plaintiff suffered an adverse employment action because of his disability (i.e.: termination, denial of waiver); and d) Plaintiff's request for reasonable accommodations were not an undue hardship on Defendants HACS and JAL.

56.    As a direct result of Defendants HACS and JAL's actions/inactions, Plaintiff has suffered damages to be proven at trial herein.

## COUNT III

(Perceived Disability in Violation of the Americans With Disabilities Act ("ADA") and s378-2 HRS Perceived Disability Discrimination)

57.    Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1 to 56 above as fully set forth herein.

58.    In the alternative to Count II, if Plaintiff was not disabled according to the law, Defendants HACS and JAL violated the ADA 42 USCA s12112 and s378-2 HRS: a) Plaintiff may have an impairment which is not substantially limiting but was treated by Defendants HACS and JAL as constituting a substantially limiting impairment; and/or b) Plaintiff may have an impairment which is only substantially limiting because of the attitudes of Defendants HACS and JAL toward the impairment; and/or c) Plaintiff may have no impairment at all but was regarded by Defendants HACS and JAL as having a substantially limiting impairment.

59.    As a direct result of Defendants HACS and JAL's actions/inactions, Plaintiff has suffered damages to be proven at trial herein.

### COUNT IV

### (BREACH OF CONTRACT)

60.    Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1 to 59 above as fully set forth herein.

61.    Defendants HACS and JAL breached the written January 27, 1993 Pilot Contract between Defendant HACS and JAL and Plaintiff, i.e. section 1.d.:

> 1.d. The term of this AGREEMENT shall run from the date of the signing (execution) of the AGREEMENT until approximately October, 1998 and shall be automatically renewed unless SCHOGGEN notifies HACS in writing at least one year prior to the termination date of this contract that he does not wish to have this contract renewed. The termination date shall be determined upon certification of SCHOGGEN for line flying and shall be inserted hereinafter upon completion.

and section 2.1.:

> 2.1. SCHOGGEN understands that HACS must, at the request of JAZ, terminate the assignment of any CREWMEMBER who fails to maintain required qualifications, i.e., flight certification, medical certification, visas required for operations, as per JAZ Operations Manual.

and possibly other provisions.

17

62.  As a direct result of Defendants HACS and JAL's breach of the written Pilot Contract, Plaintiff has suffered damages to be proven at trial herein.

## COUNT V

### (BREACH OF CONTRACT - THIRD PARTY BENEFICIARY)

63.  Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1 to 62 above as fully set forth herein.

64.  Defendants HACS and JAL breached the written Agreement Between Japan Air Charter Co., Ltd.. (JAZ) and Hawaii Aviation Contract Services, Inc. (HACS) for HAC'S Crewmembers on Assignment to JAZ effective August 01, 1998 - July 31, 2003 (HACS-JAL Contract) which states:

> 2.11 CREWMEMBER WHO HAS FAILED JCAB PHYSICAL EXAMINATION
>
> 2.12 DECISION OF "FIT-FOR-FLIGHT" BY JAZ
>
> 2.13 CANCELLATION OF MEDICAL CERTIFICATE
>
> 6.01 UNSATISFACTORY CREW MEMBER
>
> Appendix D PROCEDURES FOR ADMINISTRATION OF CREWMEMBERS' PHYSICAL EXAMINATION AND DAILY HEALTH CARE

and possibly other provisions. This contract is subject to a protective order in Civil No. 03-00451 SPK-LEK currently on appeal to the Ninth Circuit and thus is not quoted herein. Plaintiff is a third-party beneficiary of this contract which was breached by Defendants HACS and JAL to Plaintiff's detriment.

65.  As a direct result of Defendants HACS and JAL's breach of the written HACS-JAL Contract, Plaintiff has suffered damages to be proven at trial herein.

## COUNT VI

### (INTENTIONAL INTERFERENCE WITH ECONOMIC RELATIONS)

66.    Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1 to 65 above as fully set forth herein.

67.    Defendants JAL intentionally interfered with the written January 27, 1993 contract between Defendant HACS and Plaintiff: a) the written January 27, 1993 contract between Plaintiff and Defendant HACS constituted a valid business relationship; b) Defendants JAL intentionally interfered with that relationship by i.e.: falsely informing Defendant HACS that "the JCAB has denied [Plaintiff's] application for a continuance to [his] medical certificate for flying past age sixty" and denying Plaintiff a waiver; c) Defendants JAL is a third party; d) a causal effect exists between Defendants JAL's interference and the damage to Plaintiff and Defendant HACS economic relations (false information and refusal led to termination); and e) Plaintiff suffered damages as a result (termination).

68.    As a direct result of Defendants JAL's intentional interference with economic relations, Plaintiff has suffered damages to be proven at trial herein.

## COUNT VII

### (INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS)

69.    Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1 to 68 above as fully set forth herein.

70.    The above statements, acts, and/or conduct of Defendants HACS and JAL, individually or collectively, occurring prior to and/or subsequent to the wrongful discharge of Plaintiff, constitute extreme and outrageous behavior which exceeds all bounds usually tolerated by a decent society, all done with malice and the intent to cause, or the knowledge that it would cause, severe mental and/or emotional distress to Plaintiff.

71.    As a direct result of Defendants HACS and JAL's actions/inactions, Plaintiff has suffered damages to be proven at trial herein.

## COUNT VIII

### (PUNITIVE OR EXEMPLARY DAMAGES)

19

72.    Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1 to 71 above as fully set forth herein.

73.    The above statements, acts, and/or conduct of Defendants HACS and JAL, individually or collectively, occurring prior to and/or subsequent to the wrongful discharge of Plaintiff, were and are intentional, willful, malicious, wanton, oppressive, outrageous and otherwise characterized by aggravating circumstances, and/or in callous disregard of the rights, interests and welfare of Plaintiff, sufficient to justify entitlement to exemplary or punitive damages for Plaintiff, in an amount to be demonstrated at the time of trial herein.

WHEREFORE, Plaintiff prays as follows:

a.    That Plaintiff be reinstated into his job with Defendants HACS and JAL with full seniority rights and all other benefits retroactive to his date of discharge;

b.    That Plaintiff be awarded compensatory damages, assessed jointly and severally against Defendants HACS and JAL, in an amount to be determined at trial;

c.    That Plaintiff be awarded special damages, assessed jointly and severally against Defendants HACS and JAL, in an amount to be determined at trial;

d.    That Plaintiff be awarded exemplary or punitive damages in an amount to be determined at trial;

e.    That Plaintiff be awarded attorney's fees and litigation expenses of filing and prosecuting this lawsuit; and

f.    That Plaintiff be awarded such other and further relief as this Court deems necessary and proper.

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

BRUCE G. SCHOGGEN,                    )        Civil No. _____
                                      )
                    Plaintiff,        )        DEMAND FOR JURY TRIAL
                                      )
        vs.                           )
                                      )
HAWAII AVIATION CONTRACT              )
SERVICES; JAPAN AIRLINES;             )
JALWAYS CO., LTD., a                  )
subsidiary of Japan Airlines;         )
and DOES 1-10                         )
                                      )
                    Defendants.       )
_____)

## DEMAND FOR JURY TRIAL

COMES NOW, BRUCE G. SCHOGGEN ("Plaintiff"), Plaintiff above-named and hereby demands a trial by jury and all issues so triable.

DATED:  Honolulu, Hawaii, _____12/2/_____, 2004.


_____
VENETIA K. CARPENTER-ASUI
Attorney for Plaintiff
BRUCE G. SCHOGGEN

IN THE UNITED STATES DISCTRICT COURT

FOR THE DISTRCIT OF HAWAII

| | | |
|---|---|---|
| BRUCE G. SCHOGGEN | ) | Civil No. _____ |
| | ) | |
| Plaintiff, | ) | SUMMONS |
| | ) | |
| vs. | ) | |
| | ) | |
| HAWAII AVIATION CONTRACT | ) | |
| SERVICES; JAPAN AIRLINES; | ) | |
| JAALWAYS CO., LTD., a | ) | |
| subsidiary of Japan Airlines; and | ) | |
| DOES 1-10 | ) | |
| Defendants. | ) | |

SUMMONS

STATE OF HAWAII

To the above-named Defendant(s):

You are hereby summoned and required to serve upon Venetia K. Carpenter-Asui, Plaintiff's attorney, whose address is Haseko Center, Suite 812, 820 Mililani Street, Honolulu, Hawaii 96813, an answer to the Complaint which is herewith served upon you, within twenty (20) days after service of this summons upon you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for the relief demanded in the Complaint.

This summons shall not be personally delivered between 10:00 p.m. and 6:00 a.m. on premises not open to the general public, unless a judge of the above-entitled court permits, in writing on this summons, personal delivery during those hours.

A failure to obey this summons may result in an entry of default and default judgment against the disobeying person or party.

DATED:      Honolulu, Hawaii, November 30, 2004.


_____

VENETIA K. CARPENTER-ASUI
Attorney for Plaintiff
BRUCE G. SCHOGGEN

21

DATED:    Honolulu, Hawaii, DEC 0 2 2004 _____, 2004.

WALTER A.Y.H. CHINN
_____
Clerk of the above-entitled

/s/KELCEY ____

Clerk, United States District Court
District of Hawaii

SEAL