IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

MARTIN VENTRESS and
JACK CRAWFORD,

          Plaintiffs,

    vs.

JAPAN AIRLINES; JALWAYS CO.,
LTD.; HAWAII AVIATION
CONTRACT SERVICES, INC.; and
DOES 1-10, inclusive,

          Defendants.

CIVIL NO. CV 03-00451 SPK-LEK

MEMORANDUM IN SUPPORT OF
MOTION

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ........................................................1

II.     PROCEDURAL HISTORY ..........................................1

III.    LEGAL STANDARD FOR DECIDING THIS MOTION ...........................3

IV.     RELEVANT FACTS ...................................................4

V.      ARGUMENT.............................................................9

      A.      Aviation And Regulation Of Aviation Safety Are Uniquely Federal And Preempt State Laws ........................................9

      B.      Plaintiffs' State Law Claims, Based On alleged Harassment And Retaliation Following Their "Reports" Of Aviation Safety Violations And Concerns, Are Preempted Completely By Federal Law ........................................11

VI.     THE ADA'S PREEMPTION CLAUSE ENCOMPASSES PLAINTIFFS' STATE LAW CLAIMS........................................23

VII.    PLAINTIFFS' CLAIMS RELATE TO AIRCRAFT SAFETY REGULATIONS AND FALL WITHIN THE ADA PREEMPTION CLAUSE........................................28

VIII.   PLAINTIFFS' CLAIMS ALSO ARE PREEMPTED BY THE FORD ACT (INCLUDING THE WPP) ........................................31

IX.     CONCLUSION........................................................35

# TABLE OF AUTHORITIES

**Page**

## Constitution
U.S. Const. art.VI, cl.2 ...................................................................9

## Statutes & Rules
[California] Government Code Section 12940 (k) ................................. 8, 9, 30

[California] Labor Code Section 1102.5.................................. 8, 11, 30, 31

49 U.S.C. § 41713(b)(1) ....................................................... 16, 19

49 U.S.C. § 42121(a) .....................................................................21

49 U.S.C. § 42121(a)(1), (2) ..........................................................20

49 U.S.C. § 42121(b) .....................................................................21

49 U.S.C. § 42121(b)(5) ................................................................19

49 U.S.C. § 44701 (a)(4).................................................................29

49 U.S.C. §§ 42121(b)(1) ...............................................................21

49 U.S.C. App. § 1302(a)(1)............................................................15

49 U.S.C. App. § 1302(a)(4)............................................................15

49 U.S.C. Section 40101(d)(1)-(2) ......................................... 8, 9, 30, 31

49 U.S.C. Section 42121 ....................................................... 8, 9, 30, 31

Airline Deregulation Act, 49 U.S.C. § 41713(b)(1) ....................... passim

Fed. R. Civ. P. 12(b)(6).................................................................9

Fed. R. Civ. P. 12(c)............................................................... 2, 3, 4

Federal Aviation Act ............................................................... passim

Wendell H. Ford Aviation Investment and Reform Act for the 21st Century,
    49 U.S.C. § 42121 ........................................................... passim

Whistleblower Protection Program................................................ passim

## Cases
*Air Line Pilots Ass'n, Int'l v. Quesada,*
    276 F.2d 892, 894 (2d Cir. 1960)................................... 11, 14

*Anderson v. Evergreen Int'l Airlines, Inc.,*
    886 P.2d 1068 (Or. Ct. App. 1994) ....................................31

*Banner Advertising, Inc., v. City of Boulder,*
    868 P.2d 1077, 1083 (Colo. 1994) .....................................18

# TABLE OF AUTHORITIES
## (Continued)

**Page**

*Belgard v. United Airlines*,
  857 P.2d 467, 470 (Colo. Ct. App. 1993)...................................................... 16, 25

*Bigstone Broadcasting, Inc., v. Lindbloom*,
  161 F. Supp. 2d 1009, 1017 (D.S.D. 2001)..........................................................10

*Botz v. Omni Air Int'l*,
  134 F. Supp. 2d 1042, 1047 (D. Minn. 2001) ............................................. passim

*Cipollone v. Liggett Group, Inc.*,
  505 U.S. 504, 516 (1992) ...................................................................................23

*City of Burbank v. Lockheed Air Terminal, Inc.*,
  411 U.S. 624, 633-34 (1973) ....................................................................... 10, 17

*Clegg v. Cult Awareness Network*,
  18 F.3d 752, 754 (9th Cir. 1994)...........................................................................4

*Command Helicopters, Inc., v. City of Chicago*,
  691 F. Supp. 1148, 1151 (N.D. Ill. 1998) ...........................................................18

*Dworkin v. Hustler Magazine, Inc.*,
  867 F.2d 1188, 1192 (9th Cir. 1989)......................................................................3

*Espinosa v. Continental Airlines*,
  80 F. Supp. 2d 297 (D.N.J. 2000).........................................................................31

*FMC Corp. v. Holliday*,
  498 U.S. 52, 60 (1990) ........................................................................................33

*French v. Pan Am Express, Inc.*,
  869 F.2d 1, 5 (1st Cir. 1989) ............................................................... 11, 14, 17

*Galati v. America West Airlines, Inc.*,
  69 P.3d 1011 (Ariz. Ct. App. 2003) .....................................................................27

*Galbraith v. County of Santa Clara*,
  307 F.3d 1119, 1121 (9th Cir. 2002).......................................................................4

*In re Mexico City Aircrash of October 31, 1979*,
  708 F.2d 400, 406 (9th Cir. 1983)..................................................................11, 17

*Lara-Girjikian v. Mexicana Airlines*,
  718 N.E.2d 584, 590 (Ill. App. Ct. 1999).............................................................26

*Lorillard Tobacco Co. v. Reilly*,
  533 U.S. 525, 541 (2001) ....................................................................................24

# TABLE OF AUTHORITIES
### (Continued)

**Page**

*Marlow v. AMR Services Corp.*,
  870 F. Supp. 295, 299 (D. Haw. 1994) ........................................... 24, 25, 26, 31

*Morales v. Trans World Airlines, Inc.*,
  504 U.S. 374 (1992) ....................................................... 16, 23, 24, 25

*Neitzke v. Williams*,
  490 U.S. 319, 326 (1989) ...............................................................3, 4

*Northwest Airlines, Inc., v. Gomez-Bethke*,
  1984 WL 1040 (D. Minn. Apr. 1, 1984) ...........................................18

*Northwest Airlines, Inc., v. Minnesota*,
  322 U.S. 292, 303 (1944) ...............................................................10

*Pai `Ohana v. United States*,
  875 F. Supp. 680, 684 (D. Haw. 1995) .................................................4

*Park 'N Fly, Inc. v. Dollar Park & Fly, Inc.*,
  469 U.S. 189, 194 (1985) ...............................................................23

*Parnar v. Americana Hotels, Inc.*,
  65 Hawai'i 370, 379-380, 652 P.2d 625, 630-31 (1982) ................................ 8, 25

*Regner v. Northwest Airlines, Inc.*,
  652 N.W.2d 557 (Minn. App. 2002) ....................................................27

*Rice v. Santa Fe Elevator Corp.*,
  331 U.S. 218, 230 (1947) ...............................................................32

*Ruggiero v. AMR, Corp.*,
  1995 WL 549010 (N.D. Cal., Sept. 12, 1995) ..........................................32

*Schmeling v. Nordam*,
  97 F.3d 1336, 1343 (10th Cir. 1996) ..................................................22

*Schneidewind v. ANR Pipeline Co.*,
  485 U.S. 293, 300 (1988) ...............................................................32

*Silkwood v. Kerr-McGee Corp.*,
  464 U.S. 238, 248 (1984) ...............................................................33

*Turgeau v. Admin. Review Bd., Dept. Of Labor*,
  446 F.3d 1052 (10th Cir. 2006) ........................................................19

*Turgeau v. The Nordam Group, Inc.*,
  Case No. 02-CV-965-H(M), slip op. at p. 10, (N.D. Okla., April 8, 2003),
  *aff'd sub nom.* ............................................................. 19, 22, 32

# TABLE OF AUTHORITIES
## (Continued)

**Page**

*United States v. City of Berkeley*,
  735 F. Supp. 937, 940 (E.D. Mo. 1990) ................................................................18

*Vanacore v. UNC Ardco Inc.*,
  697 So. 2d 892 (Fla. Dist. Ct. App. 1997)...........................................................32

*Ventress v. Japan Airlines,*
  486 F.3d 1111, 1114 n.3 (9th Cir. 2007) .............................................................3

*Zinermon v. Burch,*
  494 U.S. 113, 118 (1990) .....................................................................................4

## Other

BLACK'S LAW DICTIONARY 1158 (5th ed. 1979)................................................23

http:www.planecrashinfo.com/rates, htm ...............................................................15

S. Rep. No. 1811, 85th Cong., 2d Sess. 5 (1958) ..................................................10

## <u>MEMORANDUM IN SUPPORT OF MOTION</u>

## I.    <u>INTRODUCTION</u>

Defendants Japan Airlines ("**JAL**") and Jalways Co., Ltd.'s ("**JAZ**")

(collectively, "**JAL Defendants**") base their motion upon a straightforward

premise:  Plaintiffs' state law claims related to aviation safety issues are preempted

completely by the Airline Deregulation Act, 49 U.S.C. § 41713(b)(1) ("**ADA**") and

the Wendell H. Ford Aviation Investment and Reform Act for the 21st Century,

49 U.S.C. § 42121 ("**Ford Act**").  Preemption disposes of this lawsuit.

## II.    <u>PROCEDURAL HISTORY</u>

Only a fraction of this case's lengthy history is needed to understand what

claims remain and why they are federally preempted. This case was filed on

December 23, 2002, in the United States District Court for the Central District of

California.  Plaintiffs Martin Ventress ("**Ventress**") and Jack Crawford

("**Crawford**") (collectively, "**Plaintiffs**") stated five causes of action, all under

California law.  Venue was transferred to this Court in 2003.  *See* Order dated

July 24, 2003.[1]

---

[1]  In 2004, Plaintiff Crawford moved to amend the Complaint from one under
California law to one under Hawaii law.  The Court denied that motion; it ordered
the case to proceed under California law.  *Order Denying Jack Crawford's Motion
to Amend Complaint*, dated September 29, 2004.  That order awaits consideration
as an interlocutory appeal under LR74.1.  Federal preemption analysis here does
not turn on that issue; the analysis for this Motion is identical whether Hawaii or
California law applies.

On June 4, 2004, the JAL Defendants moved under Fed. R. Civ. P. 12(c) for partial dismissal on the pleadings ("**Emotional Distress Motion**").  The Emotional Distress Motion attacked Count IV (***intentional*** infliction of emotional distress) and Count V (***negligent*** infliction of emotional distress) of Plaintiffs' Complaint as barred by the exclusivity of remedy provisions of California's Workers' Compensation Statute.  On August 11, 2004, the JAL Defendants filed a motion for judgment on the pleadings or for summary judgment on all claims ("**Treaty Motion**").  The Treaty Motion sought dismissal of ***all*** counts (including those challenged in the then-pending Emotional Distress Motion), as barred by the Treaty of Friendship, Commerce, and Navigation between the United States and Japan ("**FCN Treaty**").

Judge King consolidated the hearings on both the Emotional Distress Motion and the Treaty Motion.  Judge King granted *both* motions and issued a consolidated order.[2]  The Dismissal Order disposed of the entire case, and Judgment for the JAL Defendants was entered on October 25, 2004.  *See Judgment In A Civil Case, dated 10/25/2004*. Plaintiffs appealed to the Ninth Circuit, but ***only*** appealed that portion of the Dismissal Order on the Treaty Motion; Plaintiffs

---

[2] *See Order Severing Defendants and Granting Defendants Japan Airlines and Jalways Co., Ltd.'s (1) Motion for Judgment on the Pleadings (Regarding Emotional Distress Claims); and (2) Motion for Judgment on the Pleadings and/or for Summary Judgment (Regarding the FCN Treaty), filed October 20, 2004* ("**Dismissal Order**").

did **not** appeal the grant of the Emotional Distress Motion.  Litigation in the Ninth

Circuit ensued.  On April 24, 2007, the Ninth Circuit reversed the portion of

dismissal based on the FCN Treaty (*i.e.,* the Treaty Motion), and it affirmed the

dismissal of Counts IV and V (*i.e.*, the Emotional Distress Motion).[3]

The case has been narrowed greatly.  Counts IV and V are no longer

operative; only Counts I through III remain.  Those counts deal with

"whistleblowing" about alleged aviation safety violations committed by the JAL

Defendants.  Compl., Counts I, II, III.  Those Counts are the subject of this Motion.

## III.  LEGAL STANDARD FOR DECIDING THIS MOTION

The standard under Rule 12(c) mirrors that under Rule 12(b)(6).  *Dworkin v.*

*Hustler Magazine, Inc.*, 867 F.2d 1188, 1192 (9th Cir. 1989) ("[T]he motions are

functionally identical[.]").  "Rule 12(b)(6) authorizes a court to dismiss a claim on

the basis of a dispositive issue of law."  *Neitzke v. Williams*, 490 U.S. 319, 326

(1989).  "This procedure, operating on the assumption that the factual allegations

in the complaint are true, streamlines litigation by dispensing with needless

discovery and fact finding.  Nothing in Rule 12(b)(6) confines its sweep to claims

of law which are obviously insupportable."  *Id.* at 326-27.  "On the contrary, if as a

---

[3] *Ventress v. Japan Airlines,* 486 F.3d 1111, 1114 n.3 (9th Cir. 2007) ("The district court held the emotional distress claims failed as a matter of California law, and neither of the plaintiffs appeal that decision.").  The case was then remanded to this Court for further proceedings.  *Id.* at 1119.

matter of law 'it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations,' a claim must be dismissed, without regard to whether it is based on an outlandish legal theory or on a close but ultimately unavailing one." *Id.* at 327. For a Rule 12(c) motion, "[r]eview is limited to the contents of the complaint." *Clegg v. Cult Awareness Network,* 18 F.3d 752, 754 (9th Cir. 1994). The court may consider documents attached to the pleadings, without converting the motion into one for summary judgment. *Pai `Ohana v. United States,* 875 F. Supp. 680, 684 (D. Haw. 1995).

## IV.   **RELEVANT FACTS**

This pure law motion relies only on the face of the Complaint and the application of the law to the facts alleged therein. No extrinsic evidence is needed; the facts below control disposition of this Motion. All are drawn from the Complaint (and accepted as true for this Motion);[4] all implicate issues unequivocally and directly relating to aviation flight safety:

> Plaintiff Ventress was a DC-10 Flight Engineer flying for the JAL Defendants.

Compl. ¶ 10.

> Plaintiff Crawford was a DC-10 Pilot flying for the JAL Defendants.

---

[4]  *See Zinermon v. Burch,* 494 U.S. 113, 118 (1990) ("For … a Rule 12(b)(6) dismissal, the factual allegations of [the] complaint are taken as true."); *Galbraith v. County of Santa Clara,* 307 F.3d 1119, 1121 (9th Cir. 2002) ("[W]e take the factual allegations of the complaint as true" when evaluating a motion to dismiss).

*Id.* ¶ 11.

> On the morning of June 17, 2001, Plaintiffs were "deadhead" passengers on Defendants JAL's flight number 728 from Bangkok, Thailand bound for Osaka, Japan.  Prior to the flight, Plaintiff MARTIN VENTRESS spoke with captain Upgrade Jeff Bicknell, who stated that he was not feeling well.  During the flight, Plaintiffs twice witnessed Captain Upgrade Bicknell being carried from the cockpit to the lavatory by Flight Engineer Tony Frieberg.  On the final approach for landing Plaintiffs could feel that the aircraft was unstable for landing, and at approximately 100 feet from the ground, the aircraft initiated a "Go-Around."  The second attempt to land was also very unstable, and the aircraft was landed hard.

*Id.* ¶ 12.

> After the flight, Plaintiffs spoke with Mr. Bicknell and Mr. Frieberg, and were told that Captain Hanami had allowed Mr. Bicknell, who was obviously incapacitated, to continue to fly the aircraft and attempt to make both landings.  Captain Hanami's conduct was in violation of several provisions of Defendants JAL's Operations Manual, Japanese and American Aviation laws.

*Id.* ¶ 13.

> On June 20, 2001, Plaintiff MARTIN VENTRESS was acting as Flight Engineer on Defendants JAL's flight number JO95 from Honolulu, Hawaii to Hiroshima, Japan with a continuation to Osaka Japan, and Captain Hanami was in charge with Captain Upgrade Bicknell in the "left seat."  Once again, Mr. Bicknell expressed to Plaintiff MARTIN VENTRESS that he was not feeling well.  Approximately one hour after take-off, Captain Upgrade Bicknell, who was in the "left seat", requested a pillow and blanket relinquished control of the aircraft to Captain Hanami, and proceeded to fall asleep for a least one hour.  During the nine hour flight, Captain Upgrade Bicknell did not eat any food and drank a little water, and he fell asleep two more times for at least one hour each time.  Plaintiff MARTIN VENTRESS expressed his concern to Captain Hanami, who stated that he felt that Captain Upgrade Bicknell was "just a little tired."

*Id.* ¶ 14.

> On the descent and approach for landing into Hiroshima, Japan, Captain Upgrade Bicknell was at the controls of the aircraft, and he was very lethargic and "behind the power curve" setting up for the approach.  Captain Hanami witnessed Captain Upgrade Bicknell make repeated mistakes with navigational aids and headings, which Plaintiff MARTIN VENTRESS corrected.  The landing was extremely hard, and the aircraft came to a stop at the very end of the runway, and only after Plaintiff MARTIN VENTRESS had overridden Captain Upgrade Bicknell's hand on the thrust reversers.  Despite these problems, Captain Hanami allowed Captain Upgrade Bicknell to fly the continuation to Osaka, Japan during which Captain Upgrade Bicknell failed to make commands and made another hard landing.

*Id.* ¶ 15.

> After the flight, Plaintiff MARTIN VENTRESS assisted Captain Upgrade Bicknell to a bus where he proceeded to collapse and experience convulsions.  Captain Upgrade Bicknell was rushed to the hospital where he was admitted.  Plaintiffs eventually learned that Captain Upgrade Bicknell had a cancerous tumor lodged in his brain.

*Id.* ¶ 16.

> On July 24, 2001, Plaintiff JACK CRAWFORD met with Captain Hanami.  After the meeting, Plaintiff JACK CRAWFORD wrote Captain Hanami a letter in which he expressed his concerns over Defendants JAL's policy that captains fly aircraft despite being sick.

*Id.* ¶ 17.

> After July 24, 2001 and until December 26, 2001, Plaintiff JACK CRAWFORD was subjected to a pattern of harassing conduct by Defendants JAL and its employees including, but not limited to, an unprecedented twelve "line monitor" checks, inordinate amounts of oral questions, and homework assignments.

*Id.* ¶ 18.

On November 20, 2001, Defendants JAL required Plaintiff MARTIN VENTRESS to be examined by Japanese Psychiatrists who deemed him "medically disqualified," although Plaintiff had been declared "fit for duty" by a United States psychiatrist and medical doctor.

*Id.* ¶ 19.

On December 26, 2001, Plaintiff JACK CRAWFORD was notified by Defendant HAWAII that Defendants JAL had given him an "unsatisfactory grade" of his performance, which "technically voids" Plaintiff JACK CRAWFORD's JCAB type rating, and that thus Defendant HAWAII must "cancel" the assignment to Defendants JAL.

*Id.* ¶ 20.

On December 26, and 28, 2001, Plaintiff Martin Ventress submitted two Safety Reports to Defendants JAL and HAWAII regarding the June incidents.  Plaintiff MARTIN VENTRESS also submitted the two Safety Reports to approximately 25 agencies, including the Federal Aviation Administration ("FAA") and the National Transportation Safety Board ("NTSB").

*Id.* ¶ 21.

After Plaintiff MARTIN VENTRESS submitted the two Safety Reports, Plaintiff MARTIN VENTRESS was subjected to a pattern of harassing conduct by Defendants JAL and its employees including, but not limited to, questioning Plaintiff MARTIN VENTRESS'S mental competency, requiring unnecessary psychiatric evaluations and preventing him from working.

*Id.* ¶ 22.

On April 12, 2202, Plaintiff MARTIN VENTRESS visited Defendant HAWAII's offices in Honolulu, and noticed his name on a "status board" under their "Termination List."  Plaintiff MARTIN VENTRESS has made inquiry as to his status with Defendant HAWAII, who contends that he has not been terminated despite the fact he has not been allowed to fly since September 12, 2001.

*Id.* ¶ 23.

Plaintiffs then allege the aviation safety "whistleblowing" alleged in ¶¶ 17,

21, and 22, which directly resulted in the "retaliation" alleged in ¶¶ 18, 19, 22, and

23, violated California's various s*tate* laws, statutory and common, intended to

protect whistleblowers and punish any retaliation that might them:

> In violation of [California] Labor Code Section 1102.5, Defendants JAL ...
> have retaliated against Plaintiff Martin Ventress for making such reports.

Count I, Compl. ¶ 27.

> This constructive termination constitutes harassment and is in
> retaliation for Plaintiff Martin Ventress's safety reports.  This
> constructive termination is in violation of the public policies
> expressed in [California] Government Code Section 12940 (k),
> [California] *Labor Code* section 1102.5, 49 U.S.C. Section
> 40101(d)(1)-(2) and 49 U.S.C. Section 42121.

Count II, Compl. ¶ 30.[5]

---

[5] "Public policy" claims under state common law lack legally cognizable elements
and do not contain self-effectuating policies; courts therefore insist a plaintiff
invoking that claim must find the allegedly violated public policy(ies) in other
express statutes or rules.  *Parnar v. Americana Hotels, Inc.*, 65 Hawai'i 370, 379-
380, 652 P.2d 625, 630-31 (1982) (directing that given the "vague meaning of the
term 'public policy,'" courts must ensure that such standardless "public policy"
claims be restricted to a "narrow class of cases" and that courts must "inquire
whether the employer's conduct contravenes the letter or purpose of a
constitutional, statutory, or regulatory provision or scheme.").  That accounts for
Plaintiffs' references to federal law in Counts II and III; they transparently grasp
for "public policies" in federal law as bases for a California common law "public
policy" claim.  Federal common law provides no claims for violations of "public
policy"; federal law provides only *statutory* remedies for aggrieved
whistleblowers.  *E.g.*, Ford Act, 49 U.S.C. § 42121.  Plaintiffs rejected those
*federal* remedies and elected to pursue s*tate* law claims, a fatal tactical decision.

This termination constitutes harassment and is in retaliation for Plaintiff Jack Crawford's voicing his concerns regarding Defendant JAL's policy that captains fly aircraft despite being sick. This termination is in violation of the public policies expressed in [California] *Government Code* Section 12940 (k), [California] *Labor Code* section 1102.5, 49 U.S.C. Section 40101(d)(1)-(2) and 49 U.S.C. Section 42121

Count III, Compl. ¶ 35.[6]

The JAL Defendants are entitled to dismissal of Counts I, II, and III; those Counts assert ***state law*** claims for harassment or retaliation relating to "whistleblowing" by Plaintiffs about purported aviation safety violations by the JAL Defendants. Those claims are completely preempted by ***federal*** aviation law.

## V.     ARGUMENT

### A.     Aviation And Regulation Of Aviation Safety Are Uniquely Federal And Preempt State Laws

Under our system of federated states, the federal and state governments try, when possible, to share jurisdiction over the activities of their citizens and businesses within their borders. Some activities are so important to governing the nation as a whole, however, the federal government refuses to share control over them. In those instances, the Supremacy Clause is invoked, and the Congress preempts the states from regulating those activities.[7] Regulating aviation and

---

[6] *See* note 4 (discussing Rule 12(b)(6) standard of accepting allegations as true).

[7] U.S. Const. art.VI, cl.2 ("This Constitution, and the Laws of the United States ... shall be the supreme Law of the Land; and the Judges in every State shall be bound

aviation safety is one such activity, over which the federal government exercises

supreme, unitary, and exclusive control. Congress summarized the reasons for that

express (and preemptive) entrustment of exclusive control of the aviation industry

(including issues of flight safety):

> [A]viation is unique among transportation industries in its relation to
> the federal government - it is the only one whose operations are
> conducted almost wholly within federal jurisdiction, and are subject to
> little or no regulation by States or local authorities. Thus, the federal
> government bears virtually complete responsibility for the promotion
> and supervision of this industry in the public interest.

*Bigstone Broadcasting, Inc., v. Lindbloom*, 161 F. Supp. 2d 1009, 1017 (D.S.D.

2001), *quoting* S. Rep. No. 1811, 85th Cong., 2d Sess. 5 (1958). The Supreme

Court echoes:

> Planes do not wander about in the sky like vagrant clouds. They
> move only by ***federal*** permission, subject to ***federal*** inspection, in the
> hands of ***federally*** certified personnel and under an intricate system of
> ***federal*** commands. The moment a ship taxis onto a runway it is
> caught up in an elaborate and detailed system of controls.

*City of Burbank v. Lockheed Air Terminal, Inc.*, 411 U.S. 624, 633-34 (1973)

(emphasis added) (quoting *Northwest Airlines, Inc., v. Minnesota*, 322 U.S. 292,

303 (1944)).

Congress enacted two complimentary preemptive laws to consolidate the

power over the safe operation of commercial aircraft within a single *federal*

---

thereby, any Thing in the Constitution or Laws of any State to the Contrary
notwithstanding.").

agency, *i.e.,* the Federal Aviation Administration, and to protect against retaliation, at the *federal* level, for aviation sector employees who "whistleblow" about aviation safety violations.  Airline Deregulation Act, 49 U.S.C. § 41713(b)(1) ("**ADA**"); Whistleblower Protection Program ("**WPP**") of the Wendell H. Ford Aviation Investment and Reform Act for the 21st Century ("**Ford Act**").[8]  49 U.S.C. § 42121; 49 U.S.C. § 44701(d)(1)(A).[9]

**B.** **Plaintiffs' State Law Claims, Based On alleged Harassment And Retaliation Following Their "Reports" Of Aviation Safety Violations And Concerns, Are Preempted Completely By Federal Law**

**1.** **Plaintiffs' Claims Involve Aviation Safety**

Plaintiffs are commercial airline flight deck officers.[10]  They claim the JAL Defendants fired them and "harassed" them for "whistleblowing" about alleged air-safety violations aboard various JALways' flights (Plaintiff Ventress; Compl. at ¶¶ 12-13) and landings of  JALways' aircraft (Plaintiff Crawford; Compl.

[8] Courts sometimes refer to the Ford Act as "AIR21" and even "WPP." This brief uses "**Ford Act**" generally, and "**WPP**" to indicate the "Whistleblower Protection Program" *portion* of the Ford Act.

[9] *See also Botz v. Omni Air Int'l*, 134 F. Supp. 2d 1042, 1047 (D. Minn. 2001) (discussing congressional intent for preemptive authority of Ford Act and WPP) (quoting *Air Line Pilots Ass'n, Int'l v. Quesada*, 276 F.2d 892, 894 (2d Cir. 1960)), *aff'd*, 286 F.3d 488 (8th Cir. 2002); *French v. Pan Am Express, Inc.*, 869 F.2d 1, 5 (1st Cir. 1989) (discussing preemptive authority of original FAA); *In re Mexico City Aircrash of October 31, 1979*, 708 F.2d 400, 406 (9th Cir. 1983) (FAA enacted to promote safety in aviation).  *See* note 10 on use of "FAA" acronym.

[10] Crawford is a pilot; Ventress is a flight engineer.  Compl. at ¶¶ 10, 11.

¶¶ 14-16).  *See also* Compl. at ¶¶ 17, 21, and 22 (quoted in Section IV above).

Plaintiffs allege air carrier retaliation for "whistleblowing" about air-safety

violations that allegedly nearly caused crashes of  DC-10 jumbo jets full of

passengers:

> During the flight [on June 17, 2001], Plaintiffs twice witnessed Captain Upgrade Bicknell being carried from the cockpit to the lavatory....
>
> On the final approach for landing Plaintiffs could feel that the aircraft was unstable for landing and at approximately 100 feet off the ground, the aircraft initiated a "Go-Around."  The second attempt to land was also very unstable, and the aircraft was landed hard [by ill Captain Upgrade Bicknell].

Compl. ¶ 12.

> [On June 20, 2001], [o]n the descent and approach for landing...Captain Upgrade Bicknell was [once again] at the controls of the aircraft, and he was very lethargic and "behind the power curve" setting for the approach.  Captain Hanami witnessed Captain Upgrade Bicknell make repeated mistakes with navigational aids and headings, which Plaintiff Martin Ventress corrected.  The landing was extremely hard, and the aircraft came to a stop at the very end of the runway, and only after Plaintiff Martin Ventress had overridden Captain Upgrade Bicknell's hand on the thrust reversers.

*Id.* ¶ 15.

The issue here is not whether those aviation safety-related events occurred or

threatened the lives of persons on the aircraft or the ground.  The Court must

assume those events occurred and aviation safety was at issue.  *See* fn.2.  It also

must assume the JAL Defendants harassed Plaintiffs and retaliated against them for

reporting those air safety incidents and issues.  *Id.*  Even assuming those

allegations as true, Plaintiffs' *state* law (statutory and common) claims are barred by federal preemption of air safety regulation and "whistleblowing" related to air safety.  That reality requires dismissal of Counts I-III.

> ### 2.    Regulation of the Air Transport Industry and Airline Safety is the Exclusive Domain of the *Federal* Government Under Two Distinct Aviation Preemption Laws

The thrust of this Motion is two-fold:  (1) Congress has **preempted** any *state* law whistleblowing claims based on aviation flight safety violations and; (2) in so preempting the field, Congress granted the FAA **exclusive** authority to regulate air safety (as a subset of air "commerce") and provided an **exclusive** reporting and protection program for aviation industry safety whistleblowers (*i.e.*, the WPP).

Federal preemption was established in two ways.  First, Congress preempted any state laws "related" to the "services" provided by an airline under the Airline Deregulation Act ("**ADA**"), 49 U.S.C. §§ 40101, 40120, & 41713, passed in **1978**. Second, Congress preempted any state law providing a remedy to aviation safety whistleblowers, by enacting a comprehensive *federal* whistleblower protection program called the WPP, a key part of the Ford Act, 49 U.S.C. § 42121.  The Ford Act, which created the comprehensive *federal* reporting and anti-retaliation scheme for aviation safety whistleblowers, was passed in 2000, in reaction to the rapid passage and expansion (and consequent conflicting outcomes) of multitudes of state whistleblower anti-retaliation laws.  The ADA's and the Ford Act's

preemption provisions "fill the field" of laws on aviation safety and protection of aviation safety whistleblowers; they displace all state laws addressing the same issues (*i.e.*, any purporting to protect aviation safety whistleblowers).

### a.    The Airline Deregulation Act's Preemption Provision

Complete control of aviation and aviation safety by the *federal* government (to the exclusion of states) has existed for about 50 years.  In 1958, the U.S. Congress enacted the FAA to ensure regulation of aviation safety be "centralized" in the federal government and not left to the states:

> The Federal Aviation Act was passed by Congress for the purpose of centralizing in a single authority … the power to frame rules for the safe and efficient use of the nation's airspace.

*Air Line Pilots Ass'n Int'l v. Quesada*, 276 F.2d 892, 894 (2nd Cir. 1960).  Because Congress has occupied fully the field of air safety, state laws attempting to regulate that field are *void ab initio,* no matter how well they attempt to comport with or align themselves with federal policies.  *French*, 869 F.2d at 6.  Federal interest in aviation safety predominates and renders states impotent to act.  *Id.*

The federal focus and uniformity of laws for the safe and efficient operation of the commercial aviation industry are further manifested in two amendments to the FAA relevant to the preemption in this case, *i.e.,* the ADA, and the Ford Act, which amended the ADA by creating and including the WPP.  The ADA generally

authorizes the preemption of Plaintiffs' state whistleblower claims; the Ford Act

specifically reinforces it for aviation safety-related whistleblowing.

Two of the ADA's primary purposes are the "maintenance of safety as the

highest priority in air commence" and "the placement of maximum reliance on

competitive market forces."  49 U.S.C. App. § 1302(a)(1) & (4).  The ADA

clarifies that one of the reasons Congress felt compelled to exclude the states from

regulating the aviation industry was the somewhat irreconcilable and dichotomous

goals (and internal tensions) of the ADA; *i.e.*, an emphasis on airline safety and a

simultaneous allowance for the "maximum reliance on competitive market forces"

to achieve safety.  Congress enacted the ADA to deregulate the airline industry,

and allow airlines to enter into a less regulated marketplace struggle in which

maintenance of flight safety became a competitive factor.

The ADA established a self-effectuating market mechanism in which

"punishment" for flight safety deficiencies is to be meted out by a flying public that

eschews dangerous airlines.[11]  While that made sense on the macro-national level,

Congress understood that at the micro-level of state politics, public disdain for

having passenger safety left to the vicissitudes of raw capitalism might lead to

attempts to defeat, modify, or overcome the ADA's structure and economic

---

[11] *See* **http:www.planecrashinfo.com/rates, htm** (last visited 10/10/07) for a
public listing of commercial airlines and their ranking by number of air crashes and
fatalities.

model.[12]  The ADA (and later the Ford Act) therefore included preemptive

provisions to bar the states and their laws from the field of aviation safety.

Plaintiffs' state claims are precisely the intrusive injection of state laws into an area

of unique federal concern that field preemption defeats.

The relationship between the work of airline employees and attainment of

the dual legislative purposes established by Congress was described in *Belgard v.*

*United Airlines*, 857 P.2d 467, 470 (Colo. Ct. App. 1993), *cert. denied*, 510 U.S.

1117 (1994):

> [T]he nature of an airline's services necessarily impacts upon both
> these purposes; these services must emphasize safety as a primary
> consideration, while assuring that they remain competitive in the
> market place.  Moreover, the quality of the services rendered by an
> airline employee directly impacts upon the services that that airline
> renders to its customers.

To ensure states would not interfere with the uniform national scheme of the

Federal Aviation Act, Congress enacted the ADA, with an express preemption

clause:

> [A] State...may not enact ***or enforce*** a law, regulation, or other
> provision having the force and effect of law ***related to*** a...***service*** of an
> air carrier[.]

49 U.S.C. § 41713(b)(1) (emphasis added).

---

[12] *See Morales v. Trans World Airlines, Inc.*, 504 U.S. 374 (1992) (Congress
included preemption provision in ADA and AIR21 "to ensure that the States would
not undo … federal deregulation[.]").

The ADA is intended "to promote safety in aviation and thereby protect the lives of persons who travel on board aircraft."  *In re Mexico City Aircrash of October 31, 1979*, 708 F.2d 400, 406 (9th Cir. 1983).  Congress found the creation of a single, uniform system of *federal* regulation was vital to increasing air safety.  *City of Burbank v. Lockheed Air Terminal, Inc.*, 411 U.S. 624, 639 (1973) ("a uniform and exclusive system of federal regulation" is required "if the congressional objectives underlying the [ADA] are to be fulfilled.").[13]

Field preemption was applied to the ADA in *French v. Pan Am Express, Inc.*, 869 F.2d 1 (1st Cir. 1989), which held a state statute regulating employee drug testing was preempted as it related to a pilot.  The holding instructs:

> We infer from the Federal Aviation Act an unmistakably clear intent to occupy the field of pilot regulation related to air safety, to the exclusion of state law.  In our judgment, such an intent is implicit in the pervasiveness of relevant federal regulation, the dominance of the federal interest, and the legislative goal of establishing a single, uniform system of control over air safety.  In this case, all flight plans lead to Washington.

---

[13] Several confusing acronyms occur in aviation safety law.  "FAA" can mean "Federal Aviation Act" and "Federal Aviation Administration."  The agency FAA was created by the statute FAA.  Context must guide on whether "FAA" refers to the agency or the act.  To complicate matters, the Airline Deregulation Act ("**ADA**") amended the Federal Aviation Act; "ADA" can be confused with the "Americans with Disabilities Act," which has nothing to do with the airline industry ADA.  Courts also confusingly refer to the "FAA" or the "Federal Aviation Act" when describing the amendatory ADA.  For clarity, this brief uses "ADA" in some instances where a court used "FAA."  In those instances, the substituted "ADA" is bracketed.

> We need go no further.  At the altitudes in question here, [the state law] is far too discommoding to survive.  In a nutshell, it " disturbs too much the congressionally declared scheme...."  (citation omitted).  Because Congress has adequately evinced its intention to occupy the field of pilot regulation related to air safety, we regard [the state law] as impuissant in the present setting.  We so hold.

*Id.* at 6-7.

Similarly, in *Northwest Airlines, Inc., v. Gomez-Bethke*, 1984 WL 1040 (D. Minn. Apr. 1, 1984), the court held the FAA preempted a Minnesota statute that would have required an airline to permit chemically-dependent pilots to return to duty.  The court reasoned:  "The comprehensive nature of the federal regulatory scheme governing the issuance of airman certificates clearly indicates an intent on the part of Congress to occupy the field of pilot regulation."  *Id.* at *11.  In *Command Helicopters, Inc., v. City of Chicago*, 691 F. Supp. 1148, 1151 (N.D. Ill. 1998), the court held a city ordinance governing helicopter external-load lifting operations was implicitly preempted by the FAA and its regulations, because that comprehensive legislative scheme implied Congress left no room for supplementary state regulation.  In *Banner Advertising, Inc., v. City of Boulder*, 868 P.2d 1077, 1083 (Colo. 1994), a city ordinance regulating signs towed by aircraft was held preempted by the FAA and its regulations.  In *United States v. City of Berkeley*, 735 F. Supp. 937, 940 (E.D. Mo. 1990), the city's building code was preempted by the FAA's regulations governing construction of a radar system.  It takes little to trigger complete preemption of a state law under the ADA.

b.    __The WPP__

The ADA's sweeping preemption of all claims relating to aviation

"services," 49 U.S.C. § 41713(b)(1) might have left some aviation-industry

plaintiffs with no remedy.  That result was unacceptable to Congress:  the value of

aviation safety whistleblowing is undisputed, and it is not in the public interest to

leave those whistleblowers with no possible remedy.  Congress therefore passed

the WPP to "replace" preempted state laws and offer aviation safety

whistleblowers relief if retaliated against for making an air safety complaint:

> [The WPP's] single, uniform scheme supports the conclusion that the
> WPP functions as a replacement cause of action for any state cause of
> action meant to remedy retaliatory discharges based on an employee's
> reporting of [air safety] violations.

*Turgeau v. The Nordam Group, Inc.*, Case No. 02-CV-965-H(M), slip op. at p. 10,

(N.D. Okla., April 8, 2003), *aff'd sub nom., Turgeau v. Admin. Review Bd., Dept.*

*Of Labor,* 446 F.3d 1052 (10th Cir. 2006).[14]

The Ford Act was enacted in **2000**, *before* Plaintiffs sued (in **2002**) and,

thus, the WPP was available to Plaintiffs had they chosen to utilize its reporting,

---

[14] *See Turgeau,* 446 F.2d at 1055 (upholding complete preemption for replacement provisions of WPP, stating as lower court's holding: "[P]etitioner's state wrongful discharge claim was completely preempted and replaced by AIR21."); *see also* 49 U.S.C. § 42121(b)(5) (allowing aggrieved whistleblower to initiate cause of action in federal district court to enforce privately any remedial or corrective order of the Secretary of Transportation relating to retaliation or harassment of aviation safety whistleblower).

protective, and remedial provisions. The Ford Act created a comprehensive federal

whistleblower protection program for aviation employees who lodge safety

concerns with their employer or the FAA. The Ford Act bars an air carrier from

discriminating or discharging an airline employee because he has:

> (1) provided, caused to be provided, or is about to provide (with any knowledge of the employer) or cause to be provided to the employer or Federal Government information relating to any violation or alleged violation of any order, *regulation*, or standard of the Federal Aviation Administration or any other provision of Federal law relating to *air carrier safety* under this subtitle or any other law of the United States;
>
> (2) has filed, caused to be filed, or is about to file (with any knowledge of the employer) or cause to be filed a proceeding relating to any violation or alleged violation of any order, *regulation*, or standard of the Federal Aviation Administration or any other provision of Federal law relating to *air carrier safety* under this subtitle or any other law of the United States.

49 U.S.C. § 42121(a)(1), (2) (emphasis added).

The Ford Act protects airline employees who report air-carrier safety

violations or file proceedings regarding them. The WPP is a comprehensive

regulatory scheme. It specifies four classes of protected employee conduct, and it

prescribes both the evidentiary and legal standards for determining whether a

violation has occurred and the remedy to be ordered. The WPP protects employees

from employer retaliation for "whistleblowing conduct" based on any actual or

alleged federal air-safety violation. The WPP includes a specific provision

affording comprehensive whistleblower protection to aviation employees. The

WPP also defines and prohibits discrimination against airline employees who provide information to the employer or the federal government relating to alleged violation of any order, regulation, or standard of the FAA. 49 U.S.C. § 42121(a). It also includes a comprehensive complaint procedure for the filing, investigation, resolution, and review of claims alleging whistleblower discrimination. 49 U.S.C. § 42121(b). The WPP's remedies include: (i) affirmative action to abate the alleged violation; (ii) reinstatement together with back pay; (iii) compensatory damages; and (iv) costs and expenses (including attorney's and expert fees). *Id.*[15]

---

[15] Plaintiffs eschewed the WPP's procedure and remedies. Having failed timely to exhaust the WPP's mandatory administrative conditions precedent, Plaintiffs no longer can avail themselves of the WPP:

> [Anyone] who believes that he or she has been discharged or otherwise discriminated against by any person in violation [of any aspect of the WPP] may, ***not later than 90 days*** after the date on which such violation occurs, file ...a complaint with the Secretary of Labor alleging such discharge or discrimination.
>
> ....
>
> If the Secretary conducts and investigation and issues a final order. . . the aggrieved party "may commence a civil action against the person to whom such order was issued to require compliance with such order.

49 U.S.C. §§ 42121(b)(1), (6) (emphasis added). The WPP's 90-day statute of limitations has expired. Federal preemption does not yield to equity, to extricate Plaintiffs from their strategic error. Plaintiffs refused any remedy under the WPP, expecting a bigger payday through litigation. The WPP clock has run; nothing can be done to turn back the hands of time. Federal preemption bars any remedy in civil litigation.

The WPP provides those remedies Congress deemed appropriate to protect aviation safety whistleblowers from retaliation and harassment and compensate them, if that illegal retaliation and harassment occurred.  That Plaintiffs may argue that they did not think they would have seen the same "payday" under the WPP as under state laws cannot defeat preemption.  The preemptive impact of the Ford Act does not depend on Congress creating a system of procedures, remedies, and damages perfectly mirroring those of preempted state law.  It is a tenet of preemption law that a federal "replacement" law need not provide identical remedies to the preempted state law:

> [U]nder the complete preemption doctrine, the federal cause of action need not provide the same remedy as the state cause of action.

*See Schmeling v. Nordam,* 97 F.3d 1336, 1343 (10th Cir. 1996); *see also Turgeau*, slip. op. *11, ("The Court further notes that, although the WPP and the public policy tort claim under [state] law do not provide identical remedies, that is not conclusive as to whether a federal replacement cause of action exists").  Congress wished to reign in run-away damages awards under state law—damages awards that could cripple an airline and harm its ability to provide "services" to the flying public.  Congress displaced (*i.e.* negated that risk by preempting state laws) and provided "replacement" remedies it deemed sufficient to protect whistleblowers and yet not so onerous that the damages would cripple the ability of airlines to provide air "services."  That is the essence of national federal legislation in a field

too vital to the nation to be left to the states.  That is why complete federal preemption in the field of aviation safety exists and must be upheld by this Court. *Morales*, 504 U.S. at 374.

The Ford Act (including the WPP) underscores congressional intent to preempt any state legislation regulating airline safety.  By crafting a comprehensive whistleblower protection scheme tailored to the airline industry and its employees, Congress reinforced its intent to regulate air transport nationally.

## VI.   THE ADA'S PREEMPTION CLAUSE ENCOMPASSES PLAINTIFFS' STATE LAW CLAIMS

The ADA preempts state law claims "related to … service" of an air carrier. In *Morales*, the Supreme Court held the ADA preemption provision should be construed broadly:  the scope of "relating to" is "a broad one - 'to stand in some relation; to have bearing or concern; to pertain; refer; to bring into association with or connection with,' (citing BLACK'S LAW DICTIONARY 1158 (5th ed. 1979)) - and the words thus express a broad pre-emptive purpose." *Morales*, 504 U.S. at 383.[16]

That broad scope led the Supreme Court to this standard:

---

[16] In analyzing the preemptive effect of a statute such as the ADA, the touchstone is the purpose of Congress.  *Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 516 (1992).  All Courts "begin with the language employed by Congress and the assumption that the ordinary meaning of that language accurately expresses the legislative purpose." *Park 'N Fly, Inc. v. Dollar Park & Fly, Inc.*, 469 U.S. 189, 194 (1985); *accord Morales*, 504 U.S. at 383.  Congress may evince its intent to preempt state law implicitly or explicitly.  *Cipollone*, 505 U.S. at 516.  Courts

> State enforcement actions having a connection with or reference to
> airline 'rates, routes, or services' are pre-empted under [the ADA].

*Id.* at 384.  This formulation is known as the "connection with or reference to"

standard of preemption.  Under it, even general state law claims, if applied to the

airline industry, are preempted if the gravamen of a complaint has any "connection

with or reference to" the "services" of the aviation industry.  *Id.* at 386.  Plaintiffs'

claims involve the alleged unsafe operation of commercial airliners by the JAL

Defendants; they have a "connection with or reference to" the "services" of the

aircraft involved (*i.e.*, the flights allegedly almost crashed).  Compl. ¶¶ 2, 15.

This Court has opined on aviation-safety preemption; that opinion guides

this motion: a "retaliation" claim by an airline employee with a far more tenuous

"connection with or reference to" flight safety was preempted by the "connection

to or reference to" ADA standard.  *Marlow v. AMR Services Corp.*, 870 F. Supp.

295, 299 (D. Haw. 1994) (King, J.).  In *Marlow*, the airline employee's retaliation

claim under Hawaii's whistleblower protection statute was preempted by the ADA,

because the plaintiff's duties (working on jetbridges) related to boarding

---

ordinarily do not need to consider theories of implied pre-emption where, as here,
"Congress has considered the issue of preemption and has included in the enacted
legislation a provision explicitly."  *Id.* at 517.  Because Congress has provided an
express preemption provision in the ADA, the "task is to identify the domain
expressly pre-empted."  *Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 541 (2001).

procedures, an integral part of airline's "services."  Plaintiffs' claims cannot escape

the reasoning and result of *Marlow*:

> The remaining question is whether Plaintiff's HWPA [Hawaii
> Whistleblowers Protection Act] and *Parnar* [public policy] claims
> have the requisite "connection with or reference to" air carrier
> services.  Both the HWPA and *Parnar* limit Defendants' ability to
> terminate at-will employees of jetbridge maintenance companies,
> whose work is integral to air services.  Thus, they necessarily have
> connection with or reference to air carrier services.

*Marlow*, 870 F. Supp. 299 (granting defendant's motion to dismiss, citing *Morales*

and *Belgard*) (internal citations omitted).  This Court held airline jetbridge

maintenance workers perform "work [that] is integral to air services," and

Plaintiffs' state law whistleblower and "public policy" claims therefore were

federally preempted.  *Pilot* Crawford and *Flight Engineer* Ventress—actual aircraft

flight deck officers—performed services even *more* "integral" to airline flight

operations; Plaintiffs' state law airline safety claims, involving alleged near

catastrophes and air disasters, therefore are *more* clearly preempted.  Indeed,

Courts recognize that flight deck crewmembers (such as Plaintiffs) sit at the

pinnacle of persons "integral" to flight operations and airline "services," and their

state law claims are therefore preempted by federal law:

> ***Other than piloting...the plane***, we cannot think of a position more
> related to the transportation of an air carrier than that held by
> [plaintiff]."

*Lara-Girjikian v. Mexicana Airlines*, 718 N.E.2d 584, 590 (Ill. App. Ct. 1999)

(emphasis added) (holding plaintiff's disability discrimination charge under state

law was preempted by ADA because plaintiff's duties as station sales

representative "required her to perform passenger service, ticket counter, ramp and

gate agent duties.").

　　　*Marlow* does not stand alone as preempting state law claims that intrude on

air safety concerns.  *Botz v. Omni Air Int'l*, 286 F.3d 488 (8th Cir. 2002)

summarizes the salient law:

> Our analysis of the ADA's pre-emptive effect is bolstered by
> Congress's enactment of the WPP, for the WPP's protections illustrate
> the types of claims Congress intended the ADA to pre-empt.
>
> In fashioning a single, uniform standard for dealing with employee
> complaints of air-safety violations, Congress furthered its goal of
> ensuring that the price, availability, and efficiency of air
> transportation rely primarily upon market forces and competition
> rather than allowing them to be determined by fragmented and
> inconsistent state regulation....
>
> By making the Secretary of Labor's findings and remedy order in
> response to an employee's complaint reviewable by the federal courts
> of appeals, Congress insured a more uniform interpretation of the
> WPP, and thus a more predictable response to public air-safety
> complaints, than would likely be possible if it had granted review in
> the courts of the fifty States....
>
> The WPP's single, uniform scheme for responding to air-carrier
> employees' reports of air-safety violations fosters fairness far better
> than a patchwork, hit-or-miss system of whistleblower protections
> scattered throughout the States.

*Botz*, 286 F.3d at 497 (internal citations omitted).

*Regner v. Northwest Airlines, Inc.*, 652 N.W.2d 557 (Minn. App. 2002)

illustrates that preemption of a state law claim.  In *Regner*, an airline

sued Northwest Airlines under Minnesota's whistleblower protection act, alleging

he was fired after he reported alleged safety violations to the FAA.  After

surveying the relevant case law, the Court concluded:

> Because we are persuaded by the Eight-Circuit's well-reasoned
> decision in *Botz*, we hold that the ADA preempts Regner's
> whistleblower claim.

*Id.* at 563.  *Galati v. America West Airlines, Inc.*, 69 P.3d 1011 (Ariz. Ct. App.

2003) follows suit, preempting another state whistleblower law claim:

> Galati was employed by AWA as a flight attendant until he was
> discharged in January 1999.  Galati filed suit against AWA [under
> Arizona's whistleblower protection law] asserting he was wrongfully
> terminated for being a whistleblower.
>
> * * * *
>
> The circuit court in *Botz* persuasively identified the impacts that
> conduct protected by the whistleblower statute would have on airline
> service, focusing in particular on the circumstance that a
> [crewmember's] refusal of an assignment would jeopardize "an air
> carrier's ability to complete its scheduled flights."  Because federal
> regulations specify [minimum safe crewing levels], an employee's
> refusal of an assignment could ground a scheduled flight.  The court
> concluded that the "authorization to refuse assignments, and the
> protections that the whistleblower statute provides, have a forbidden
> connection with an air carrier's service under any reasonable
> interpretation of Congress's use of the word 'service.'
>
> In the same way, if Arizona law protected Galati's refusal of the
> assignment made by his employer, it would contravene the ADA's
> preemption of state laws relating to airline services.  As the *Botz* court

stated, "the plain language of the ADA's pre-emption provision" precludes such a claim.

*Id.* at 1012, 1016 (internal citations omitted).

## VII. PLAINTIFFS' CLAIMS RELATE TO AIRCRAFT SAFETY REGULATIONS AND FALL WITHIN THE ADA PREEMPTION CLAUSE

Plaintiffs' "whistleblowing" and "public policy" claims have the elements courts seek to hold a claim preempted by the ADA and Ford Act. The claims involve the interpretation of federal safety regulations relating to the operations and flight activities of commercial airliners. The Plaintiffs' claims, when applied to the airline industry, attempt to control the "services" provided by pilots (Crawford) and flight engineers (Ventress), by challenging how the JAL Defendants crew their flights, evaluate pilot fitness to fly particular flights, deal with alleged "near miss" aviation disasters and, accordingly, seek to allow Plaintiffs to create and achieve a protectable right, *__under state law__*, to refuse to perform their assigned flight duties when they sense or claim that dangerous conditions exist.

While flight crew members who sense a dangerous condition exists should have a protectable right to protest such dangers and refuse to fly until such dangers are corrected, those rights cannot be created by *__state law__*, and federal preemption of aviation safety bars creation of those rights *__under state law__*. Congress has assigned the entire field of aviation regulatory affairs, including the regulation of

flight safety, to the Federal Aviation Administration ("**FAA**") and the Secretaries of Transportation and Labor.  The FAA has the statutory duty to promote flight safety by prescribing "regulations in the interest of safety...of service of airmen and other employees of air carriers."  49 U.S.C. § 44701 (a)(4).  At the heart of Plaintiffs' claims is a refusal to accept the JAL Defendants' handling of allegedly near-catastrophic aviation incidents, Plaintiffs' complaints related thereto, and the retaliation they allegedly suffered for their "whistleblowing":

> During the flight [on June 17, 2001], Plaintiffs twice witnessed Captain Upgrade Bicknell being carried from the cockpit to the lavatory....
>
> On the final approach for landing Plaintiffs could feel that the aircraft was unstable for landing and at approximately 100 feet off the ground, the aircraft initiated a "Go-Around."  The second attempt to land was also very unstable, and the aircraft was landed hard [by ill Captain Upgrade Bicknell].

Compl. ¶ 12.

> [On June 20, 2001], [o]n the descent and approach for landing...Captain Upgrade Bicknell was [once again] at the controls of the aircraft, and he was very lethargic and "behind the power curve" setting for the approach.  Captain Hanami witnessed Captain Upgrade Bicknell make repeated mistakes with navigational aids and headings, which Plaintiff Martin Ventress corrected.  The landing was extremely hard, and the aircraft came to a stop at the very end of the runway, and only after Plaintiff Martin Ventress had overridden Captain Upgrade Bicknell's hand on the thrust reversers.

*Id.* ¶ 15.

Plaintiffs contend they reported the JAL Defendants' supposed inaction over these events:

Plaintiff MARTIN VENTRESS also submitted the two Safety Reports to approximately 25 agencies, including the Federal Aviation Administration ("FAA") and the National Transportation Safety Board ("NTSB").

*Id.* ¶ 21.[17]  Plaintiffs contend that because of their reporting the JAL Defendants' alleged laxity toward flight safety, they were subjected to "retaliation" and "harassment."  Compl., ¶¶ 27, 30, 35.[18]

---

[17] Plaintiff Crawford was less vigorous in his "whistleblowing"; Plaintiff Ventress reported to 25 different agencies while Plaintiff Crawford allegedly made only an *internal* "complaint" to the JAL Defendants:

> On July 24, 2001, Plaintiff JACK CRAWFORD met with Captain Hanami. After the meeting, Plaintiff JACK CRAWFORD wrote Captain Hanami a letter in which he expressed his concerns over Defendants JAL's policy that captains fly aircraft despite being sick.

Compl. ¶ 17.

[18] Plaintiffs alleged "retaliation" and "harassment":

> In violation of [California] Labor Code Section 1102.5, Defendants JAL... have retaliated against Plaintiff Martin Ventress for making such reports.

Count I, Compl. ¶ 27.

> This constructive termination constitutes harassment and is in retaliation for Plaintiff Martin Ventress's safety reports.  This constructive termination is in violation of the public policies expressed in [California] *Government Code* Section 12940 (k), [California] *Labor Code* section 1102.5, 49 U.S.C. Section 40101(d)(1)-(2) and 49 U.S.C. Section 42121.

Count II, Compl. ¶ 30.

> This termination constitutes harassment and is in retaliation for Plaintiff  Jack Crawford's voicing his concerns regarding Defendant JAL's policy that captains fly aircraft despite being sick.  This termination is in violation of the public policies expressed in [California] *Government Code* Section 12940 (k), [California] *Labor*

Plaintiffs' Complaint is perfectly structured for the preemptive effects of the ADA and the WPP of the Ford Act. Actual flight deck personnel, a pilot and a flight engineer (and not someone distantly connected with the operation of the aircraft as in *Marlow,* but whose connection to airline "services" still was adequate for this Court to find preemption), unequivocally complain about the purportedly unsafe operation of commercial airliners. They complain about those perceived safety issues to a slew of agencies, and allege the airline responded with "harassment" and "retaliation" against them. True or not, there is no doubt that ***state law*** has been excluded by express federal preemption from being an avenue of recourse for those flight deck personnel.

## VIII. PLAINTIFFS' CLAIMS ALSO ARE PREEMPTED BY THE FORD ACT (INCLUDING THE WPP)

Most federal courts found the FAA's/ADA's preemption provision sufficient to preempt state law whistleblower claims (as in *Marlow*). Not all federal courts originally agreed that state whistleblower claims "related to" the "services" of an airline and were thus preempted.[19] To eliminate ambiguity about the FAA's

---

*Code* section 1102.5, 49 U.S.C. Section 40101(d)(1)-(2) and 49 U.S.C. Section 42121.

Count III, Compl. ¶ 35.

[19] *E.g., Anderson v. Evergreen Int'l Airlines, Inc.*, 886 P.2d 1068 (Or. Ct. App. 1994); *Espinosa v. Continental Airlines*, 80 F. Supp. 2d 297 (D.N.J. 2000);

preemption and underscore the intent to "fill the field" and centralize all aviation

safety litigation under *federal* law, Congress overrode all contrary court decisions

with the Ford Act (including the WPP), to achieve complete "field preemption."[20]

The Ford Act was "belt and suspenders" legislation, resulting in complete

"field preemption."  With the Ford Act (and WPP), Congress clarified that state

law whistleblower claims by air crews are "related to" the "services" of air carriers

and are preempted (redundantly) under a congressional fiat of complete field

preemption.[21]  *Botz* summarizes:

---

*Ruggiero v. AMR, Corp.*, 1995 WL 549010 (N.D. Cal., Sept. 12, 1995); *Vanacore v. UNC Ardco Inc.*, 697 So. 2d 892 (Fla. Dist. Ct. App. 1997).

[20] *Botz,* 286 F.3d at 497 ("[T]he WPP's protections illustrate the types of claims Congress intended the ADA to pre-empt."); *Turgeau*, slip. op. at 10 ("The WPP thus sought to make clear that any state retaliatory discharge claims relating to the reporting of FAA violations were preempted by the WPP.").

[21] Field preemption occurs if federal law "thoroughly occupies" the "legislative field" in question.  Here, the field is aviation safety.  The Supreme Court has characterized field preemption:

> Congress implicitly may indicate an intent to occupy a given field to the exclusion of state law.  Such a purpose properly may be inferred where the pervasiveness of the federal regulation precludes supplementation by the States, where the federal interest in the field is sufficiently dominant, or where " the object sought to be obtained by the federal law and the character of obligations imposed by it…reveal the same purpose."

*Schneidewind v. ANR Pipeline Co.*, 485 U.S. 293, 300 (1988) (citation omitted). Implied federal preemption may be found where federal regulation of the field is pervasive.  *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947).  It also may

> By making the Secretary of Labor's findings and remedy order in response to an employee's complaint reviewable by the federal courts of appeals, Congress insured a more uniform interpretation of the WPP, and thus a more predictable response to public air-safety complaints, than would likely be possible if it had granted review in the courts of the fifty States.
>
> The WPP's single, uniform scheme for responding to air-carrier employees' reports of air safety violations fosters fairness far better than a patchwork, hit-or-miss system of whistleblower protections scattered throughout the States.

286 F.3d at 497 (internal citations omitted).[22]

Applying the rationale of those cases here, Congress likewise has expressed its intent to occupy the field of pilot and flight engineer claims related to air safety. Plaintiffs' claim their "whistleblowing" on alleged flight safety concerns is protected by ***state*** laws barring retaliation against "whistleblowers."  Any application of those laws treads impermissibly on a regulatory field *fully occupied* by the federal government.  The Ford Act extended federal regulation to protect airline employees from retaliation for reporting flight safety issues; it (including the WPP) affords comprehensive whistleblower protection to aviation employees.

---

be found where state regulation of the field would interfere with congressional objectives.  *Silkwood v. Kerr-McGee Corp.*, 464 U.S. 238, 248 (1984).

[22] The ERISA statute exemplifies complete federal "field preemption."  *Botz* found the WPP's "field preemption" of aviation safety whistleblowing as equally broad as the ERISA statute.  *Botz*, 286 F.3d at 497 (citing *FMC Corp. v. Holliday,* 498 U.S. 52, 60 (1990), for the proposition that the WPP is similar to ERISA in that a "patchwork scheme of regulation would introduce considerable inefficiencies…" and, thus "we have applied the pre-emption clause to ensure that benefit plans will be governed by only a single set of regulations.").

The Ford Act *expanded* the comprehensive federal system for reporting regulatory infractions and protecting airline employees who report safety violations. When examined in the context of federal supremacy in the field of aviation safety, the implication is inescapable that state statutes intruding on these issues are preempted. A single program covering the reporting of regulatory violations promotes aviation safety, a primary purpose of the FAA and ADA. That centralization ensures information on airline safety will be addressed by the federal agency charged with implementing aviation safety regulations. Without a centralized reporting system, the Federal Aviation Administration would not necessarily be privy to available information on airline safety.

The Ford Act amplifies the ADA's preemptive force:

> Our analysis of the ADA's pre-emptive effect is bolstered by Congress's enactment of the WPP, for the WPP's protections illustrate the types of claims Congress intended the ADA to pre-empt.

> In fashioning a single, uniform standard for dealing with employee complaints of air-safety violations, Congress furthered its goal of ensuring that the price, availability, and efficiency of air transportation rely primarily upon market forces and competition rather than allowing them to be determined by fragmented and inconsistent state regulation....

> By making the Secretary of Labor's findings and remedy order in response to an employee's complaint reviewable by the federal courts of appeals, Congress insured a more uniform interpretation of the WPP, and thus a more predictable response to public air-safety complaints, than would likely be possible if it had granted review in the courts of the fifty States....

> The WPP's single, uniform scheme for responding to air-carrier employees' reports of air-safety violations fosters fairness far better than a patchwork, hit-or-miss system of whistleblower protections scattered throughout the States.

*Botz*, 286 F.3d at 497 (internal citations omitted).  Plaintiffs' ***state law*** claims cannot be harmonized with the preemptive effects of the FAA, ADA, and Ford Act.  The field of aviation safety is closed to state law, including Plaintiffs' claims.

## IX.    CONCLUSION

Plaintiffs' state law claims for statutory "whistleblowing" retaliation and harassment and common law "public policy" violations are preempted by federal law.  This Court must dismiss Counts I, II and III and enter final judgment for the JAL Defendants.  (Counts I-III are the only claims that remain.)

DATED:  Honolulu, Hawaii, October 19, 2007.


/s/ Andrew L. Pepper
ANDREW L. PEPPER
STEVEN M. EGESDAL
JOSEPH F. KOTOWSKI, III

Attorneys for Defendants
JAPAN AIRLINES and
JALWAYS CO., LTD.